ARKANSAS FUEL OIL COMPANY *v.* WESTBROOK.

4-7367                                    180 S. W. 2d 826

Opinion delivered June 5, 1944.

*Wm. R. Arendt* and *Jas. S. McConnell,* for appellant.

*George Edwin Steel* and *Boyd Tackett,* for appellee.

GRIFFIN SMITH, Chief Justice. Walter Westbrook, by contract made in December 1937, became retail distributing agent for Arkansas Fuel Oil Company.[1]

---

[1] Westbrook executed bond conditioned upon the faithful discharge of duties assumed under the written contract. Sureties were Grady H. Ward and J. W. Bagley.

Judgment for $442.96 was rendered against Westbrook February 24, 1941. Complaint upon which that judgment was based alleged continuous indebtedness by open account, approximate amount of which was $800 January 26, 1938. A year later Westbrook's resignation was requested.

The litigation resulting in this appeal was begun December 21, 1942, when the Company filed suit against Westbrook and his wife, Wincie; also against J. W. Bagley and his wife, Eugenia, and others. It was alleged that Walter had fraudulently disposed of assets, the act having the effect of rendering him insolvent. Specifically, it was charged that the judgment debtor had conveyed to the Bagleys three lots in the City of Nashville, Arkansas, and that the Bagleys had thereupon conveyed to Mrs. Westbrook. Walter's deed was dated January 26,[2] 1938, the recited consideration being $850. The following day the Bagleys conveyed to Mrs. Westbrook for, *prima facie,* $850.[3]

In addition to his duties as distributor, Westbrook operated a filling station where he sold the Company's products at retail. Bagley had been Westbrook's employe from 1933 to 1936. After 1936 he rented from Westbrook and operated a filling station on the lots which form the subject-matter of this suit, and was so renting in January 1938.

Bagley denied there was an agreement that after receiving the Westbrook deed there should be reconveyance to Westbrook or his wife. He testified that consideration for the transaction of January 26 was $1,000 —not $850 as shown by the deed. Explanation was that Walter owed him $150. Actual payment was ". . . part cash and part checks—I don't remember how much cash and how much checks."

On cross-examination Walter insisted that he paid $500 in cash and $350 in checks,—"or the other way;

---

[2] The deed was executed jointly by Walter Westbrook and his wife, the latter having relinquished dower, homestead, etc. It was filed for record February 9, 1938.

[3] Filed for record February 12, 1938.

one of the two—it was about half and half. He never did cash the check; I tore it up." [4]

Bagley testified that following the purchase on January 26th, Walter appeared at the station early the next morning and told him Mrs. Westbrook wanted the property for a building place.—"He talked on about it and just wondered if I would cancel the deed and sell it to him or to her: any way to get it back in her hands so she would be satisfied." Bagley says that he, being anxious to accommodate, and not wanting to have trouble "between the families," agreed to make the deed to Mrs. Westbrook.

Walter Westbrook's version is that the first transaction was *bona fide,* that it was a "legal sale." He also contends that the account on which judgment was rendered was his personal obligation as distinguished from an obligation as distributor. The difference, he said, was that in January, 1939, he owed the Company for charges made to him personally representing supplies received at the filling station. His line of credit at the station was $800.—"A year or two later they took judgment." [5]

Mrs. Westbrook testified she had property of her own and was not accountable to her husband for certain inherited funds. After joining Walter in sale of the lots to the Bagleys she "studied about it all night" and came to the conclusion she would repurchase, if possible. When told, as a witness, Bagley had testified that at the time the property was deeded back ". . . he (Bagley) paid Walter the same checks and money he had received the day before," her answer was, "Well, possibly so; possibly some checks and some money. I don't know just exactly what the transaction was between Walter and

---

[4] It may be observed that in the first reference to the amount claimed to have been paid *other than with cash,* Bagley mentioned "checks"—plural. The second reference is to "it," as though a single check were given and held by Westbrook, then returned.

[5] The Court found that the bond did not cover sales made by Westbrook through his filling station, but was restricted to distributor transactions; hence sureties were released. This is conceded by appellant.

Mr. Bagley. I know my part of it: . . . I paid $850 in cash." [6]

If it be conceded that Walter Westbrook did not owe the oil company on his account as distributor, evidence is convincing that he had been continuously in arrears on the filling station account. His own testimony was that when discharged (January, 1939) he owed the Company a personal account, the amount being $405, and ". . . a year or two later they took judgment for it." [7]

Westbrook also testified that those who purchased from the Company through the distributor agency had individual lines of credit with the Company, and these accounts were not charged to him. [8]

In April, 1937, the Company wrote letters, demanding payment of $1,023.69 (some of which may have been distributor items) and threatening to close Westbrook's account unless satisfactory arrangements were made. December the first (same year) he was told that while monthly payments equaled monthly charges, his delinquent balance was $700 or more. Mention was made of an understanding "some time ago" that the indebtedness should be reduced substantially each month.

December 4, 1937—less than two months before Bagley undertook to buy the lots—Westbrook wrote the Company asking it to "glide along" with him for the next four or five months. He closed with a request that the Company "be as easy as possible for a few months, and I will keep the account current."

We cannot escape the conclusion that when Westbrook made his deed to Bagley he owed an amount equal to the sum for which judgment was taken, and the balance never fell below this figure. It is also clear, from Westbrook's statements, and from inferences drawn from

---

[6] The property was mortgaged to a loan association. Its security is not affected.

[7] The account sued on was $505.32. With interest it was $442.96.

[8] A condition of the bond was that Westbrook should not credit parties other than those approved by the Company, "nor shall he receive credit for sales made to approved customers beyond the amount approved by the credit department."

the testimony of others that the transfer rendered Westbrook insolvent.

Westbrook's testimony regarding the method of payment contradicts his wife, who swore she paid $850 in cash. Nor is there explanation of Bagley's act in deeding the property back, as he terms it, and not collecting $150 alleged to have been due him. Of course Bagley could have elected to continue carrying the debt; but it seems strange that, having paid $850 in cash and checks, and having canceled an old account, he should apparently forget all about it and turn the property back to Westbrook for the exact amount alleged to have been paid. But our decision is not controlled by this inconsistency, if such it is. There are many circumstances pointing to the practical conclusion that there was no intent Bagley should have the property. Instead, he appears to have lent his name and assistance to Westbrook's scheme to denude himself of assets.

Our view is that the Chancellor erred in that part of the decree in which it was found that the Bagleys and Mrs. Westbrook were innocent purchasers. Reversed, with directions to cancel the deeds. The cause is remanded for further proceedings not inconsistent with this opinion.